# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE ZENDESK, INC. SECTION 220 LITIGATION | ) ) ) ) | Consolidated C.A. No. 2023-0454-BWD |

## POST-TRIAL FINAL REPORT

Final Report: August 25, 2023
Date Submitted: August 21, 2023

Kimberly A. Evans and Robert Erikson, of BLOCK & LEVITON LLP, Wilmington, Delaware; OF COUNSEL: Jason M. Leviton, Joel A. Fleming, and Lauren Godles Milgroom, of BLOCK & LEVITON LLP, Boston, Massachusetts, *Attorneys for Plaintiffs Laborers' District Council and Contractors' Pension Fund of Ohio, Amethyst Arbitrage International Master Fund, and Suzanne Rudy*.

Ned Weinberger and Mark Richardson, of LABATON SUCHAROW LLP, Wilmington, Delaware; OF COUNSEL: David Schwartz and John Vielandi, of LABATON SUCHAROW LLP, New York, New York; Jeremy Friedman and David Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; and D. Seamus Kaskela and Adrienne Bell, of KASKELA LAW LLC, Newtown Square, Pennsylvania, *Attorneys for Plaintiffs Laborers' District Council and Contractors' Pension Fund of Ohio, Amethyst Arbitrage International Master Fund, and Suzanne Rudy*.

Richard D. Heins and Tiffany Geyer Lydon, of ASHBY & GEDDES, P.A., Wilmington, Delaware; OF COUNSEL: Donald J. Enright and Noah R. Gemma, of LEVI & KORSINSKY, LLP, Washington, D.C., *Attorneys for Plaintiffs Rocky Ongkowidjojo and Gary Buchheim*.

Garrett B. Moritz and Holly E. Newell, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Stephen R. DiPrima and Joseph S. Tobin, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Defendant Zendesk, Inc*.

**DAVID, M.**

In October 2021, Zendesk, Inc. ("Zendesk" or the "Company") announced that it had entered into an agreement to acquire Momentive Global Inc., formerly known as SurveyMonkey, in an all-stock merger. That transaction, which valued Zendesk common stock at approximately $124 per share, drew criticism from Zendesk stockholders, including activist investor JANA Partners, who denounced Zendesk's "inexplicable" decision to use an "artificially depressed stock price" for Zendesk in the deal.

In early February 2022, Zendesk's board of directors (the "Board") received an unsolicited competing proposal from a consortium of private equity firms (the "Consortium") proposing to acquire Zendesk for a price between $127 and $132 per share in cash. The Board rejected that proposal, concluding that it "significantly undervalued" the Company. In response, JANA called for the Board to "be replaced with capable fiduciaries or reverse course and engage with interested strategic and financial buyers to sell the Company," and declared its intent to launch a proxy contest. A few weeks later, Zendesk stockholders overwhelmingly voted against the issuance of Zendesk common stock required to consummate the Momentive transaction.

After terminating the Momentive transaction, the Board commenced a process to review strategic alternatives, during which it contacted 26 potential counterparties. The process generated two indications of interest—one from the

1

Consortium for $120 per share and one from a second bidder for $125 to $135 per share—but neither resulted in a financed bid.  In early June, the Board decided to terminate the strategic review and continue to execute on the Company's strategic plan as a standalone company.

While the strategic review was ongoing, the Board engaged with JANA in an attempt to settle its proxy fight.  As of June 17, 2022, the Board was prepared to settle JANA's proxy contest by ousting the Company's CEO and replacing three directors with JANA designees.  The same day the settlement agreement was prepared, however, the Consortium made a new (lower) acquisition proposal. Management promptly cut the Company's long-range forecasts and, based on those lowered projections, the Board approved a sale at $77.50 per share, nearly 40% lower than the proposal it had rejected four months earlier.

Eight Zendesk stockholders served demands pursuant to 8 *Del. C.* § 220 seeking to investigate possible wrongdoing in connection with that deal.  In response, Zendesk voluntarily produced 335 board-level documents, totaling 5,281 pages, concerning the issues raised in the demands.  Plaintiffs now seek to supplement that production with emails, claiming there are "gaps" and "inconsistencies" in the formal board materials.  In this final report, I conclude that Plaintiffs have stated a proper purpose for inspecting books and records, but that the materials already produced are sufficient for their purpose.

## I. BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pre-trial order, exhibits attached to the pleadings and pre-trial briefing, and argument presented at a one-day paper trial held on August 21, 2023.[1]

### A. Zendesk Announces An All-Stock Transaction With Momentive, Prompting An Activist Campaign.

Prior to the Transaction, Zendesk was a publicly traded Delaware corporation that offered software-as-a-service products related to customer support, sales, and other customer communications. The Board consisted of ten directors, including a lead independent director, Carl Bass, and Zendesk's co-founder, CEO, and Chairman of the Board, Mikkel Svane. Shelagh Glaser served as the Company's CFO and John Geschke served as Chief of Staff.

On October 28, 2021, Zendesk announced that it had entered into an agreement to acquire Momentive Global Inc. ("Momentive"), formerly known as SurveyMonkey, in an all-stock merger (the "Momentive Transaction").[2] The Momentive Transaction, which valued Zendesk common stock at approximately

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Exhibits attached to Plaintiffs' Pre-Trial Brief ("PB"), Dkt. 33, are cited as "PX __". Exhibits attached to Defendant Zendesk, Inc.'s Pre-Trial Answering Brief ("DB"), Dkt. 49, are cited as "DX __".

[2] PX 2, Zendesk, Inc., Proxy Statement (Schedule 14A) 28 (Aug. 8, 2022) [hereinafter, "Proxy"].

$124 per share, drew criticism from Zendesk stockholders, including activist investor JANA Partners ("JANA"). On November 30, 2021, JANA sent an open letter to the Board opposing the Momentive Transaction and stating JANA's intent to vote against the issuance of Zendesk common stock required to consummate the Momentive Transaction.[3] On January 3, 2022, JANA sent another letter denouncing the Board's "inexplicabl[e]" decision to use an "artificially depressed stock price" for Zendesk to acquire Momentive.[4]

## B. The Board Rejects A Competing Proposal To Acquire Zendesk For $127 To $132 Per Share.

On February 7, 2022, the Board received an unsolicited proposal from a consortium of private equity firms, including Permira Advisors LLC and Hellman & Friedman LLC (collectively, the "Consortium"), to acquire Zendesk for a price between $127 and $132 per share in cash, subject to due diligence and other conditions (the "February 7 Consortium Proposal").[5]

On February 9, 2022, the Board held a meeting at which Goldman Sachs ("Goldman") and Centerview Partners ("Centerview") made presentations to the Board regarding the February 7 Consortium Proposal. The Board concluded that the

---

[3] *Id*. at 28.

[4] PX 16.

[5] Proxy at 28.

February 7 Consortium Proposal "significantly undervalued Zendesk and that it was not in the best interests of Zendesk and its stockholders to alter Zendesk's existing strategic plan and pursue the proposed transaction with the Consortium."[6] The next day, Zendesk issued a press release announcing its receipt, review, and rejection of the February 7 Consortium Proposal.[7]

### C. Zendesk Stockholders Reject The Momentive Transaction.

On February 16, 2022, JANA sent another open letter to the Board opposing the Momentive Transaction.[8] JANA's letter claimed that Zendesk's "lengthy effort to win support for the Momentive acquisition ha[d] been met by vociferous and sustained rebuke," and noted that proxy advisory firms ISS and Glass Lewis had advised Zendesk stockholders to vote against the Momentive Transaction.[9] JANA called for the Board to "be replaced with capable fiduciaries or reverse course and engage with interested strategic and financial buyers to sell the Company," and declared its intent to nominate four director nominees for election to the Board at Zendesk's 2022 annual meeting.[10] The same day, a *Reuters* article reported that an anonymous "portfolio manager at a prominent mutual fund company" had stated "he

---

[6] *Id*. at 29.

[7] PTO ¶ 24.

[8] *Id*. ¶ 26.

[9] PX 5.

[10] *Id*.

would support replacing board members and would also like to see management replaced."[11]

On February 25, 2022, Zendesk stockholders voted against the Momentive Transaction, and Zendesk announced the termination of the Momentive Transaction.[12]

### D. JANA Continues To Press For A Sale Or Leadership Change.

On February 28, 2022, JANA sent another open letter to the Board, claiming that the stockholder votes cast to approve the Momentive Transaction represented "the lowest level of support of any disclosed deal-related shareholder vote (buyer or seller) in the Russell 3000 in the last 20 years (and possibly ever)."[13] JANA's letter criticized the Board for being "disengaged and totally out of touch with shareholder priorities" and "lack[ing] the requisite skillset to govern the company," and demanded leadership changes or a sale of the Company.[14]

On March 7, 2022, the Board met with management and advisors at Qatalyst Partners ("Qatalyst") and Wachtell, Lipton, Rosen & Katz ("Wachtell") to discuss

---

[11] Svea Herbst-Bayliss, *Jana Partners launches proxy fight at Zendesk, nominates four to board*, REUTERS (Feb. 16, 2022), https://www.reuters.com/business/finance/exclusive-jana-partners-launches-proxy-fight-zendesk-nominates-four-board-2022-02-16/.

[12] Proxy at 29.

[13] PX 56.

[14] *Id*.

the process for reviewing strategic alternatives and engagement with JANA.[15] In advance of that meeting, the Board received an 80-page presentation from Qatalyst that summarized observations and recommendations regarding JANA's proxy fight.[16] The presentation advised that "[i]nitial engagement [with JANA] should focus on creating a record, drawing out specific ideas JANA has for enhancing shareholder value and, if the Board decides to publicly announce strategic alternatives, providing JANA with the opportunity to provide its perspectives on potential interest/value thresholds," and that "engagement regarding a potential settlement should occur after the passage of some time, when there is more clarity regarding the strategic alternatives process and/or progress has been made on standalone alternatives."[17] The presentation also described JANA's "ultimate" and "secondary" objectives, provided an illustrative timeline for the proxy contest, and summarized settlement considerations.[18]

### E. The Board Amends Zendesk's Equity Plan To Accelerate Unvested Equity Grants In A Sale.

On March 14, 2022, the Board's compensation committee met with Svane and Geschke to discuss management retention "[s]hould the board elect to publicly

---

[15] Proxy at 29-30.

[16] PX 21.

[17] *Id*.

[18] *Id*.

announce the pursuit of a strategic review."[19]  Materials for that meeting explain that in the event of a sale, Zendesk's equity incentive plan did "not mandate a specific treatment of equity awards of Zendesk in a situation where an acquirer does not assume the equity awards of Zendesk and decides to terminate the plan instead."[20] The compensation committee recommended "expressly provid[ing] for acceleration for all employees in the event an acquirer does not assume outstanding equity incentives."[21]  On April 27, 2022, the Board approved amending Zendesk's equity plan for employees at the VP level and above.[22]

**F.      The Board Undertakes A Strategic Review While It Engages With JANA.**

On March 16, 2022, the Board commenced a process to review strategic alternatives, and also "directed management to work with outside advisors to engage with JANA in connection with the proxy contest."[23]  During the strategic review, Qatalyst contacted 26 potential counterparties, including 16 potential strategic partners and ten potential financial sponsors.[24]

---

[19] PX 23.

[20] *Id.*

[21] *Id.*

[22] DX E at 48.

[23] PX 24.

[24] Proxy at 30.

On March 23, 2022, the Board met to discuss the status of the strategic review and engagement with JANA.[25] In advance of that meeting, the Board received a presentation prepared by Qatalyst summarizing the Company's engagement with JANA and other stockholders, and detailing a "near-term engagement plan for JANA."[26] The Board discussed "engagements that had taken place earlier in the week" between Zendesk and JANA, including that management had reached out to JANA to schedule a meeting and requested the opportunity for Zendesk's outside search firm to interview JANA's director candidates, but JANA had refused.[27] The Board determined that Qatalyst would reach out to JANA the following week.[28]

On April 13, 2022, the Board "discussed and reviewed the potential proxy contest with JANA Partners, and continued this discussion" at a Board meeting on April 15, 2022,[29] where it considered settlement scenarios with JANA, including "a sale of the Company and a settlement with JANA, no sale of the Company and a settlement with JANA, or no sale of the Company and a proxy contest decided at the

---

[25] *Id.*

[26] DX KK.

[27] PX 25.

[28] Shortly thereafter, the Board also received an April 4, 2022 document with detailed "Talking Points and Q&A For Director Engagement with JANA." DX LL.

[29] Proxy at 31.

annual meeting of shareholders."[30]  The Board discussed "the potential proxy contest timeline and process," including "key dates in the process, the key decisions that would need to be made, and the legal and strategic context for those decisions."[31]

An April 13, 2023 document titled "Post-JANA Debrief and Selected Observations" provides additional detail on discussions with JANA, explaining that Zendesk "participants generally led the dialogue" and the "[f]ocus of discussion was on JANA's demand for a sale of the company," although "JANA reiterated its commitment (absent a sale) to pursue board change."[32]  The document further explains that "JANA offered only high-level comments on opportunities for improvement" and there was "[e]xtensive discussion regarding JANA's value expectations," including that "JANA stated that it believes unaffected price is $100-110/share," "JANA offered some directional views regarding value expectations in a sale, but did not offer a specific figure," and "JANA stated that, if a broad/comprehensive process was run, JANA believes that the price produced by such a process would be a good indication of [Zendesk]'s value."[33]

---

[30] PX 29.

[31] *Id.*

[32] PX 28.

[33] *Id.*

10

### G. Zendesk Receives Two Indications Of Interest That Do Not Result In A Financed Bid.

On May 5, 2022, Zendesk received an indication of interest from the Consortium to acquire Zendesk common stock for $120 per share, and an indication of interest from another potential counterparty, "Bidder 2," to acquire Zendesk common stock for $125 to $135 per share.[34]

Between May 4 and May 24, 2022, however, Zendesk's stock price fell by 29%, from $123.65 to $88.18. On May 24, 2022, the Consortium informed Qatalyst that it had lost several members of its bidding group due to concerns about Zendesk's business momentum and potentially worsening market conditions, and did not have the financing necessary to submit a final proposal.[35]

On May 26, 2022, Bidder 2 informed the Company that "in light of declining valuations of comparable companies, ongoing market uncertainty and deteriorating business momentum of Zendesk, [it] would not be able to submit a proposal within or close to their previously indicated range," and that it might "be able to offer as high as $110.00 per share of Zendesk common stock but would require several additional weeks to secure the necessary equity financing."[36] On May 28, 2022, at

---

[34] Proxy at 32.

[35] *Id*. at 34.

[36] *Id*.

the Board's direction, Qatalyst informed Bidder 2 that it would need to improve its proposal to $115 per share.[37] On June 1, 2022, Bidder 2 informed Qatalyst that it was not able to offer $115 per share and that even at a lower range, "deteriorating market conditions and volatility were causing the internal processes for limited partners to secure financing to be extended . . . ."[38]

**H.** **The Company Concludes Its Strategic Review And Engages With JANA About Board And Management Changes.**

On June 6, 2022, the Board held two meetings at which it decided to terminate the strategic review and continue to execute on the Company's strategic plan as a standalone company.[39] The Board also considered an "illustrative proposal" for a settlement between Zendesk and JANA prepared by Qatalyst.[40] Qatalyst's presentation highlighted potential risks associated with JANA's proxy contest, including that JANA "may expand its demands beyond what it c[ould] achieve in a proxy fight[,]" which could include "[m]ak[ing] commitments to changes in management" and a "majority board change."[41]

---

[37] *Id*. at 35.

[38] *Id*.

[39] PX 33.

[40] PX 34.

[41] PX 35.

The Board determined to "seek to have discussions with JANA pursuant to a short-term confidentiality agreement before making any public announcement with respect to the strategic review process."[42] The next day, however, JANA informed the Company that it would not sign a limited NDA,[43] and on June 8, 2022, JANA issued a press release announcing its intention to sue Zendesk to compel the Company to schedule its 2022 annual meeting.[44] On June 9, 2022, Zendesk publicly announced that it had concluded its strategic review and would remain a standalone company.[45]

Two days later, on June 11, 2022, the Board held a meeting at which it "discussed feedback from JANA" following issuance of the June 9 press release and "potential changes to the composition of the Board and the management team in connection with a possible settlement with JANA."[46] In an executive session, the Board agreed to "seek a settlement of the proxy contest with JANA and that designated members of the Board, with representatives from Wachtell Lipton and

---

[42] PX 34.

[43] Proxy at 36.

[44] *Id*.

[45] *Id*.

[46] PX 37.

Qatalyst, should have discussions with representatives of JANA with respect to the terms of such a settlement."[47]

On June 14, 2022, the Wall Street Journal reported that "Zendesk and JANA [we]re discussing a truce that could involve Mikkel Svane stepping down as the software company's chief executive, as well as changes to the board, including the removal of director Carl Bass[.]"[48]

The same day, the Consortium expressed its continued interest in a transaction with Zendesk, "subject to receipt of additional due diligence, including on actual results for gross and net bookings for May 2022 and an update on Zendesk's overall business momentum."[49] The Consortium indicated a proposal "could be as high as $82.00 per share, if actual results for May 2022 were in line with their expectations and subject to satisfactory responses to certain other confirmatory due diligence items."[50]

---

[47] *Id.*

[48] Dana Camiculla, *Zendesk Is in Settlement Talks With Activist Investor Jana*, WALL ST. J. (June 14, 2022), https://www.wsj.com/articles/zendesk-is-in-settlement-talks-with-activist-investor-jana-11655239833.

[49] Proxy at 36.

[50] *Id.* at 36-37.

14

On June 15, 2022, the Board discussed the potential terms of a settlement with JANA.[51] According to the June 15 minutes, the Company had "presented the proposal previously approved by the Board to JANA and discussed JANA's reaction and responses on the key points of negotiation in a potential settlement, including director appointments, committee assignments, potential management transition, standstill restrictions on JANA, and issues related to the retention of Company employees."[52]

A June 17, 2022 draft settlement agreement reveals the terms of the potential settlement discussed at the June 15 Board meeting. The draft contemplates that the Board would remove Svane as CEO, initiate a process for identifying his successor, "cause or accept the resignation of three (3) current directors of the Company from the Board . . . two (2) from Class II and one (1) from Class I, as previously identified to JANA," and appoint two JANA nominees to fill the vacancies.[53]

### I. Zendesk Receives A New Proposal From The Consortium, And Management Adjusts Company Projections.

Also on June 17, 2022, the Company received a proposal from the Consortium to acquire Zendesk for $75.50 per share (the "June 17 Consortium Proposal").[54] The

---

[51] *Id.* at 37.

[52] PX 38.

[53] PX 39.

[54] Proxy at 37.

Proxy states that "[d]uring a conversation with representatives of the Consortium, such representatives indicated that they had lowered the price at which they were willing to transact in light of the actual gross and net bookings results for May 2022, which were weaker than they had expected, and the continued deterioration in business momentum at Zendesk."[55]

Following receipt of the June 17 Consortium Proposal, Zendesk and JANA entered into a limited NDA which permitted Zendesk to disclose the June 17 Consortium Proposal to JANA.[56] At a meeting with Zendesk on June 19, 2022, JANA "expressed support for Zendesk being open to the proposed transaction and attempting to engage with the Consortium in an effort to see if it were possible to improve on the proposed price."[57]

Later that day, the Board met to review the status of settlement discussions with JANA and the June 17 Consortium Proposal.[58] At the June 19 meeting, members of Zendesk management discussed with the Board that it had updated Zendesk's long-range plan (the "June Projections") to account for changes in economic conditions, negative trends in gross and net bookings for Zendesk, and

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 38.

deterioration in business momentum that deviated materially from the assumptions underlying the projections prepared in March 2022.[59]

Between June 17 and June 23, 2022, Bidder 2 indicated that it would not submit a proposal without seeing actual gross and net bookings data for June 2022 and assurances that business momentum was improving.[60]  Separately, on June 21, 2022, the Consortium submitted a "best and final" proposal to acquire Zendesk for $77.50 per share (the "June 21 Consortium Proposal").[61]  Qatalyst informed JANA of the June 21 Consortium Proposal, and JANA advised that it would not oppose a transaction at $77.50 per share and "would expect to terminate its proxy contest upon announcement of such a transaction."[62]

## J.     The Board Approves A Transaction With The Consortium For $77.50 Per Share.

On June 22, 2022, the Board held a meeting at which management presented the June Projections to the Board.[63]  Thereafter, the Board authorized its advisors to move forward with finalizing proposed definitive agreements for a transaction

---

[59] *Id*.  Management created two sets of projections—a "Baseline" case and an "Upside Opportunity" case.  PX 44.

[60] Proxy at 38.

[61] *Id*.

[62] *Id*. at 38-39.

[63] *Id*. at 39.

through which the Consortium would acquire Zendesk for $77.50 per share of common stock (the "Transaction").[64]

On June 23, 2022, the Board met to consider whether to approve the Transaction.[65] Members of Zendesk management discussed the June Projections and the Board approved their use by Zendesk's financial advisors in connection with their analyses of the Transaction.[66] Qatalyst and Goldman each provided oral fairness opinions, subsequently confirmed in writing, that the Transaction was fair, from a financial point of view, to Zendesk common stockholders.[67]

The Board then recessed the meeting and Wachtell contacted JANA to confirm whether JANA would agree to withdraw its nominations in light of the Transaction. JANA confirmed its "willingness to agree to withdraw its director nomination notice effective as of 5:00 p.m. on June 24, 2022 if Zendesk were to announce an agreement for a sale of Zendesk at the $77.50 per share cash price no later than the opening of market on June 24, 2022."[68] The Board then reconvened and approved the Transaction.

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.* at 39-40.

[68] *Id.* at 40.

## K. The Board Rejects A Recapitalization Proposal From Light Street.

On August 28, 2022, Light Street Capital Management, LLC ("Light Street") sent a letter to the Board proposing a recapitalization transaction contemplating a $2 billion preferred equity investment in the Company and a $2 billion debt facility that would be used to conduct a $5 billion tender offer at $82.50 per share.[69]  In its letter, Light Street claimed that "[t]here [wa]s no justifiable reason to sell the Company at a price more than 40% below the offer initially rejected by the Board."[70] On August 31, 2022, the Board met and determined that Light Street's proposal "did not constitute and would not reasonably be expected to result in a superior proposal."[71]

## L. The Transaction Closes.

On September 19, 2022, Zendesk stockholders voted to approve the Transaction.  The Transaction closed on November 22, 2022.  One week later, on December 1, 2022, Zendesk announced that Svane and Glaser had resigned from the Company effective November 28 and December 1, 2022, respectively.[72]

---

[69] PX 15.

[70] *Id.*

[71] PX 48; *see also* DX OO (Qatalyst presentation summarizing Light Street's proposal).

[72] PX 3.

## M. The Demands

Between August 5 and September 7, 2022, eight stockholders served demands on the Company pursuant to 8 *Del. C.* § 220 (collectively, the "Demands"), seeking to inspect books and records of the Company. The stated purposes of each Demand include the investigation of potential wrongdoing in connection with the Transaction.

In response to the Demands, Zendesk voluntarily produced 335 documents, totaling 5,281 pages, including Board minutes and other formal Board-level documents concerning the Momentive Transaction, the Transaction, and JANA; bid process letters and written offers; director questionnaires; advisor engagement letters; reports from proxy advisory services; copies of Zendesk's financial projections and forecasts; and NDAs with potential acquirers (the "Production").

Unsatisfied with that Production, on March 1, 2023, Plaintiffs' counsel sent Zendesk's counsel a proposed protocol to govern the search and review of electronic communications in response to the Demands.[73] The protocol sought electronic communications from seven custodians over a three-month period.[74] Zendesk declined to produce electronic communications in response to the Demands.

---

[73] PX 10.

[74] *Id.*

## N.    Procedural History

Between September 16 and September 19, 2022, three stockholder complaints were filed in this Court to compel inspection of books and records pursuant to Section 220.[75]  Those actions were voluntarily stayed to allow the parties to negotiate a potential resolution of the Demands.

In addition, in September 2022, Zendesk and four stockholders entered into "Standing Agreements" that contractually replicate the stockholders' statutory rights under Section 220 and prevent the Company from asserting that the closing of the Transaction extinguished the stockholders' standing to pursue books and records pursuant to their Demands.[76]  On April 24, 2023, three of those four stockholders filed a complaint to compel inspection of books and records pursuant to Section 220.[77]

On May 23, 2023, I entered a stipulation and order coordinating the four actions, mandating that resolution of this coordinated action shall apply to all parties (the "Coordination Order").  The Coordination Order also permitted other

---

[75] *See McGinnis v. Zendesk, Inc.*, C.A. No. 2022-0827-BWD (Del. Ch.); *Police & Fire Ret. Sys. of the City of Detroit v. Zendesk, Inc.*, C.A. No. 2022-0830-BWD (Del. Ch.); *Ongkowidjojo v. Zendesk, Inc.*, C.A. No. 2022-0833-BWD (Del. Ch.).

[76] The parties have not briefed whether those stockholders are entitled to books and records as a matter of contract or statutory entitlement (or both).  The result is the same either way.

[77] *Amethyst Arbitrage Int'l Master Fund v. Zendesk, Inc.*, C.A. No. 2023-0454-BWD (Del. Ch.).

stockholders who served Demands to join this action by filing a complaint or a notice of appearance as an interested party on or before May 26, 2023. One additional stockholder who is party to a Standing Agreement entered an appearance on May 24, 2023.

On June 26, 2023, Plaintiffs filed their Pre-Trial Brief, attaching as Exhibit 1 a new proposed search protocol to govern Plaintiffs' requested inspection. That protocol seeks electronic communications on three topics, proposing parameters significantly broader than the ones sent to Zendesk's counsel in March.[78] Zendesk filed its Pre-Trial Answering Brief on July 26, 2023.

A one-day trial on a paper record was held on August 21, 2023.[79]

## II.    ANALYSIS

"To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection." *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020). "If a stockholder meets these requirements, the stockholder must then establish 'that each

---

[78] PX 1.

[79] Trial was initially scheduled for July 19, 2023, but was rescheduled to August 21, 2023 at the parties' request.

22

category of the books and records requested is essential and sufficient to the stockholder's stated purpose.'" *Id.*

The parties agree that the Demands complied with the form and manner requirements of Section 220. The parties dispute only whether Plaintiffs have demonstrated a proper purpose to inspect books and records and, if so, whether they are entitled to inspect electronic communications in response to the Demands.

**A.    Plaintiffs Have Demonstrated A Proper Purpose For Inspection.**

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). "In a section 220 action, a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

Plaintiffs here seek books and records to investigate potential wrongdoing in connection with the Transaction. Under Delaware law, a stockholder's desire to investigate wrongdoing is a proper purpose. However, "[a] mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief." *Seinfeld*, 909 A.2d at 122. To establish a proper purpose of investigating wrongdoing, a stockholder "'must

23

present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred.'" *Pettry*, 2020 WL 6870461, at \*10.

The credible basis standard imposes "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123. It does not require a stockholder to prove that the wrongdoing "actually occurred." *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at \*4 (Del. Ch. Apr. 28, 2004). It does not require a stockholder "to show by a preponderance of the evidence that wrongdoing is probable." *Lebanon Cnty. Employees' Ret. Fund v. Amerisourcebergen Corp.*, 2020 WL 132752, at \*8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020). It requires only that a stockholder "establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing." *Pettry*, 2020 WL 6870461, at \*11 (emphasis in original). That burden may be "'satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'" *Id.*

Plaintiffs have demonstrated a credible basis to suspect the possibility of wrongdoing in connection with the Transaction. To meet their burden, Plaintiffs point to facts showing that in February 2022, the Board rejected an acquisition proposal for $127 to 132 per share because it "significantly undervalued" the Company. Yet four months later, in June 2022, the Board approved a sale at $77.50 per share. In the intervening period, an activist investor launched a public campaign

seeking to replace the Board and management in the absence of a sale. Plaintiffs have made a credible showing that the Board was prepared to agree to a settlement with the activist that would have resulted in a potentially embarrassing public ouster of the Company's CEO and replacement of four of ten directors on the Board. But the same day that settlement agreement was prepared, the Board received a new, albeit lower, proposal to acquire the Company. In response, management significantly cut the Company's long-range forecasts and, based on those lowered projections, the Board approved a sale at a price nearly 40% less than the offer it had rejected four months earlier. Under the lowest possible burden of proof, those facts in the aggregate establish a credible basis to investigate wrongdoing in connection with the Transaction.

The Company pokes holes in Plaintiffs' "entrenchment theory," explaining that "if the deal went through, Zendesk's outside directors would be out of a job" anyway, and "if the supposed scheme was to entrench Svane, it failed miserably," since he resigned one week after the deal closed.[80] As I understand it, Plaintiffs argue that management may have favored a sale to protect their positions—it is not clear when Svane and Glaser decided to resign—*or* they may have favored a sale to protect their reputations. Plaintiffs theorize that once it became apparent that the

---

[80] DB at 29-30.

Board would accede to JANA's demands, management was motivated to favor a transaction that would either secure their continued employment or, alternatively, permit them to exit the Company on their own terms with millions of dollars in vested equity grants. Again, this satisfies Plaintiffs' low burden to demonstrate a credible basis to suspect wrongdoing.

The Company also raises several additional merits-based arguments to challenge Plaintiffs' showing of a credible basis. Zendesk contends the facts presented here are unlike those in *PLX*[81] or *Xura*,[82] in which the Court sustained breach of fiduciary duty claims arising from a merger approved in the face of activist pressure, and more closely resemble *Rudd v. Brown*[83] and *Lukens*,[84] where similar theories were rejected on the pleadings. Zendesk also argues that the Transaction was approved by a majority of disinterested and independent directors,[85] Svane's equity interest in the Company incentivized him to get the best price in the deal,[86] and the Board's decision to sell the Company in June at a price lower than the

---

[81] *In re PLX Tech. Inc. S'holders Litig.*, C.A. No. 9880-VCL (Del. Ch. Sept. 3, 2015) (TRANSCRIPT).

[82] *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677 (Del. Ch. Dec. 10, 2018).

[83] *Rudd v. Brown*, 2020 WL 5494526 (Del. Ch. Sept. 11, 2020).

[84] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[85] DB at 29, 32.

[86] *Id*. at 31.

February proposal made sense in light of market conditions affecting cloud stocks in 2022.[87] "This Court has repeatedly stated that a Section 220 proceeding does not warrant a trial on the merits of underlying claims." *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 (Del. Ch. Feb. 28, 2018), *aff'd sub nom. UnitedHealth Grp. Inc. v. Amalgamated Bank as Tr. for Longview Largecap 500 Index Fund*, 196 A.3d 885 (Del. 2018).[88] While Zendesk's responses may carry the day in plenary litigation, they do not, at this stage, undermine Plaintiffs' showing of a credible basis under the lowest possible burden of proof.

---

[87] *Id.* at 34. Relying on *City of Westland Police & Fire Retirement System v. Axcelis Technologies, Inc.*, Zendesk asserts that "a precipitous drop in stock price" is insufficient to support a credible basis to investigate wrongdoing. 2009 WL 3086537, at *8 (Del. Ch. Sept. 28, 2009), *aff'd*, 1 A.3d 281 (Del. 2010). JANA's public campaign to replace management followed by management's downward revision of projections distinguish these facts from *Axcelis*.

[88] *See also AmerisourceBergen Corp. v. Lebanon Cnty. Emps.' Ret. Fund*, 243 A.3d 417, 437 (Del. 2020) ("[A] Section 220 proceeding 'is not the time for a merits assessment of Plaintiffs' potential claims against [the corporation's] fiduciaries.'"); *Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *13 (Del. Ch. Jan. 25, 2019) (rejecting "merits contentions that are best reserved for any potential plenary litigation that may follow the Demand"), *aff'd*, 237 A.3d 818 (Del. 2020); *Lavin v. W. Corp.*, 2017 WL 6728702, at *9 (Del. Ch. Dec. 29, 2017), *judgment entered*, (Del. Ch. 2018) ("[W]hen a stockholder demands inspection as a means to investigate wrongdoing in contemplation of a class or derivative action, Delaware courts generally do not evaluate the viability of the demand based on the likelihood that the stockholder will succeed in a plenary action."); *Khanna v. Covad Commc'ns Grp., Inc.*, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004) (rejecting the argument that "various transactions were approved by a majority of directors whose independence and disinterestedness are not fairly questioned," explaining that "[a] Section 220 action is not the proper forum for litigating a breach of fiduciary duty case" and "[a]ll that the Section 220 plaintiff must show is a credible basis for claiming that 'there are legitimate issues of wrongdoing'").

27

## B. Plaintiffs Have Not Established That Electronic Communications Are Essential To Accomplishing Their Purpose.

Where a stockholder establishes a proper purpose for inspecting books and records under Section 220, the Court must evaluate the scope of the request. "The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it." *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *8 (Del. Ch. Aug. 31, 2022).

The stockholder plaintiff "'bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'" *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019). "Books and records satisfy this standard 'if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'" *Id.* "Keeping in mind that § 220 inspections are not tantamount to 'comprehensive discovery,' the Court of Chancery must tailor its order for inspection to cover only those books and records that are 'essential and sufficient to the stockholder's stated purpose.' In other words, the court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'" *Id.* at 751-52.

To determine which documents are necessary and essential to accomplish a proper purpose, recent decisions have grouped requests for books and records into three categories:

- "Formal Board Materials," or "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered;"

- "Informal Board Materials," which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings," and sometimes including "emails and other types of communication sent among the directors themselves;" and

- "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."

*Hightower*, 2022 WL 3970155, at *9 (quoting *Lebanon Cnty. Emps.' Ret. Fund*, 2020 WL 132752, at *25).

Formal Board Materials are the starting point—and typically the ending point—for a sufficient inspection. *Woods, Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 2020 WL 4200131, at *11 (Del. Ch. July 22, 2020). Decisions considering requests for Informal Board Materials and/or Officer-Level Materials in the form of emails "reflect the principle that the Court of Chancery should not order emails to be produced when [Formal Board Materials] would accomplish the petitioner's proper purpose, but if non-email books and records are insufficient, then the court should order emails to be produced." *KT4 Partners LLC*, 203 A.3d at 752-53. Whether Formal Board Materials are sufficient for a stockholder's purposes is fact dependent, but generally speaking, a broader inspection may be needed if the

29

Board did not honor traditional corporate formalities, the alleged wrongdoing happened exclusively at the officer level, or the Formal Board Materials fail to address key events. *See Oklahoma Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at \*12 (Del. Ch. June 1, 2022); *Hightower*, 2022 WL 3970155, at \*10.

The Board here honored corporate formalities in the process leading to the Transaction. Zendesk's production of Formal Board Materials comprised 335 documents, totaling 5,281 pages, including Board meeting minutes and presentations, bid process letters and written offers, director questionnaires, projections and forecasts, and agreements with potential acquirers. In search of a foothold to argue for an even broader inspection, however, Plaintiffs identify supposed "gaps" and "inconsistencies" in the Formal Board Materials. According to Plaintiffs, these deficiencies require production of: (1) electronic communications from seven custodians over a five-month period regarding the Board's negotiations with JANA; (2) electronic communications from five custodians over a ten-month period regarding director and officer retention and compensation; and (3) electronic communications from four custodians over an eight-month period regarding "the actual and projected financial performance of Zendesk."[89]

---

[89] PX 1.

As explained below, Plaintiffs have not met their burden to prove that electronic communications concerning any of these topics are essential to accomplishing the proper purposes stated in their Demands.

### 1. Negotiations With JANA

Plaintiffs first seek electronic communications concerning Zendesk's negotiations with JANA. According to Plaintiffs, the Formal Board Materials on this topic contain "material gaps" and "inconsistencies," such that the "Production fails to answer basic questions about how th[e] settlement with JANA evolved, fell apart, or affected the Board's deliberation about the Transaction."[90] Plaintiffs have not met their burden to establish that electronic communications concerning JANA are essential to their investigation purpose.

Plaintiffs have already received documents sufficient to investigate the Board's discussions with JANA. Indeed, documents in the Production address Zendesk's negotiations with JANA in far more detail than Plaintiffs' briefing suggests. For example, in early March 2022, the Board received an 80-page presentation from Qatalyst advising on engagement with JANA, detailing objectives for JANA's proxy contest, providing an illustrative timeline for the proxy contest,

---

[90] PB at 50.

and summarizing various settlement considerations.[91]  Shortly thereafter, in connection with a March 23, 2022 meeting, the Board received another presentation from Qatalyst summarizing the Company's engagement with JANA and detailing a "near-term engagement plan for JANA" that identified the parties involved, proposed timing, key messaging, and the rationale for each aspect of the proposed plan.[92]  Around the same time, the Board received a document titled "Project Zenith: JANA Engagement Plan," which scripted proposed messaging to JANA in four phases and outlined illustrative responses to potential demands that JANA might make.[93]  The Board received an April 4, 2022 document outlining "Talking Points and Q&A For Director Engagement with JANA" in detail,[94] and an April 13, 2022 document providing a "Post-JANA Debrief and Selected Observations" with additional updates on discussions with JANA.[95]  In June 2022, the Board received a presentation outlining "Considerations Regarding Next Steps with JANA Partners," including an overview of potential risks associated with JANA's proxy contest.[96] And the Production also includes the June 17, 2022 draft settlement agreement,

---

[91] PX 21.

[92] DX KK.

[93] DX JJ.

[94] DX LL.

[95] PX 28.

[96] PX 35.

32

which reflects the terms that the Board was prepared to accept in a potential settlement with JANA.[97] To be sure, Plaintiffs still have questions, but the suggestion that the Formal Board Materials "fail to answer *basic* questions" about the Board's engagement with JANA mischaracterizes the record. *See Frank v. Nat'l Holdings Corp.*, C.A. No. 2021-0160-MTZ, at 15-16 (Del. Ch. July 22, 2022) (TRANSCRIPT) ("[Plaintiff's] position is that so long as he has questions that are left unanswered, or rocks he has not overturned, he is entitled to more. That is not our law, particularly in the context of board and management communications.").

Despite the detailed information in the Production addressing Zendesk's engagement with JANA, Plaintiffs contend there are still "material gaps" in the Production necessitating email review. As one example, Plaintiffs claim that a March 30, 2022 Qatalyst presentation "has a bullet titled 'JANA engagement update,' but neither the presentation nor the minutes provide the substance of Qatalyst's conversations with JANA or Qatalyst's overview to the Board about those conversations."[98] But the March 30, 2022 Board minutes explain that Qatalyst "provided an overview of [its] recent conversation with JANA, including JANA's overall tone and the topics and questions raised by JANA, *including as to the*

---

[97] PX 39.

[98] PB at 48 (citing PX 27).

*potential timing of the Company's annual meeting*."[99]  The minutes are not transcripts—they do not need to be—but this description provides sufficient detail to orient Plaintiffs as to what was discussed.  As another example, Plaintiffs suggest that "none of the materials produced illuminate the substance of the Board's discussions of the settlement scenarios" contemplated at an April 15, 2022 Board meeting.[100]  In fact, the April 15, 2022 Board minutes explain that "[t]he scenarios discussed included a sale of the Company and a settlement with JANA, no sale of the Company and a settlement with JANA, or no sale of the Company and a proxy contest decided at the annual meeting of shareholders," and that the Board agreed it "should continue to engage with potential director candidates who might be added to the Board, including as part of a settlement with JANA or as part of a Board nominated slate in the event of a proxy contest with JANA."[101]  Again, this provides sufficient information to understand what the Board considered and concluded. Plaintiffs' characterizations of other Board meeting minutes as "nondescript" and "largely redacted" are similarly off base.[102]

---

[99] PX 26 (emphasis added).

[100] PB at 48.

[101] PX 29.

[102] *See* PB at 49-50.

34

Plaintiffs also identify what they claim are "inconsistencies" between the Production and the Proxy. Many of Plaintiffs' examples are not actually inconsistencies, but instances in which the produced documents provide more detail than the Proxy.[103] Others are nitpicky.[104] In light of the extensive information already provided in the Formal Board Materials, none support production of electronic communications.

## 2. Director And Officer Retention And Compensation

Plaintiffs also seek electronic communications concerning "director and officer retention and compensation."[105] Of Plaintiffs' three requests, this is the most amorphous. Although Plaintiffs already have sufficient information to understand the financial incentives of Zendesk's directors and officers in the Transaction, Plaintiffs seek emails evidencing whether Zendesk's fiduciaries were motivated by those incentives to proceed with the Transaction. In large part, Plaintiffs rely on

---

[103] *See id.* at 51 ("[U]nlike the internal notes, the Proxy does not mention that JANA valued the Company on a standalone unaffected basis at over $100 per share."); *id.* ("[T]he Proxy does not disclose that the Company sent a draft settlement agreement to JANA between June 17 and June 19 or that the agreement would have required Svane to step down as Zendesk's CEO."). *See also, e.g.*, *id.* at 10-11, 13-15, 17, 21, 23, 25-27 (pointing out details from Formal Board Materials that are not included in the Proxy).

[104] *See id.* at 51 ("The Proxy states that two members of the Board and 'members [plural] of Zendesk management' were present, but internal notes state that two Board members and only one member of Company management attended that JANA meeting."); *id.* (claiming "the Company's internal documents reverse the supposed order of JANA's priorities").

[105] *Id.* at 53.

*Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*[106] to carry their burden. It does not work.

The Proxy and the Production include the information necessary and essential to investigate the financial incentives of Zendesk's directors and officers. The Proxy describes in detail the "Interests of Zendesk's Executive Officers and Directors in the Merger," including with respect to the treatment of outstanding equity awards, vesting of unvested stock options and stock-based awards upon termination after the merger, severance benefits, and equity retention grants for certain executive officers.[107] The Proxy also includes a table summarizing the compensation Zendesk executive officers would receive if they were terminated without cause or resigned for good reason after the merger closed.[108] Further, the Production includes materials for the March 14, 2022 Zendesk compensation committee meeting at which the committee recommended amending Zendesk's equity incentive plan to provide for acceleration of unvested equity awards in the event of a sale,[109] as well

---

[106] 2019 WL 479082 (Del. Ch. Jan. 25, 2019), *aff'd*, 237 A.3d 818 (Del. 2020).

[107] Proxy at 65-70. *See also* PB at 8 ("Svane received over $6.5 million through the conversion of his unvested RSUs to cash as a result of the Transaction."); *id*. at 7 n.16 ("Glaser received $1.5 million in the form of a 'Retention Grant,' . . . which partially offset the loss of $3,467,289 worth of options . . . that expired worthless based on the Consortium's buyout price of $77.50.").

[108] Proxy at 70.

[109] PX 23.

as minutes and resolutions of the June 23, 2022 Board meeting at which the Board approved a retention equity award plan and severance program.[110]

Although Plaintiffs have what they need to understand the financial incentives in the Transaction, they rely on *Calgon* to argue that electronic communications are necessary to investigate "whether and to what extent members of Zendesk management were motivated by their personal incentives in deciding to proceed with the Transaction."[111]  In that case, the Court found that the stockholder seeking to investigate whether "management prioritized their own retention and compensation over the interests of . . . stockholders" had met its burden to prove that it was "unlikely to uncover any meaningful answers in more traditional, formal books and records . . . ."  *Calgon*, 2019 WL 479082, at *18.  But "[i]n *Calgon*, which predates *AmerisourceBergen* and *Palantir*, the defendant had refused to produce any documents before trial, so the stockholder did not have the opportunity to review or rely on formal board materials in support of its investigative purposes."  *Frank*, C.A. No. 2021-0160-MTZ, Tr. at 20.[112]  If Calgon had voluntarily produced Formal Board

---

[110] PX 52; DX MM.

[111] PB at 54.

[112] *See also Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *9 (Del. Ch. Feb. 25, 2021), *judgment entered*, (Del. Ch. 2021) ("[U]nlike in *Calgon*, where the record revealed the target company did not maintain formal board-level documents reflecting its decision-

Materials like Zendesk did here, it might have obviated the need to produce electronic communications.

Plaintiffs also contend that the Production "leaves critical questions about retention and compensation issues unanswered."[113] For example, Plaintiffs ask "[w]hat issues related to the 'potential management transition' and 'retention of Company employees' . . . the Board discuss[ed] at its undocumented executive sessions," but a description of discussions during executive sessions is not likely to be found in email.[114] Plaintiffs speculate that "retention and compensation" issues might "explain[] the Board's knee-jerk rejection of Light Street's proposal,"[115] but the Formal Board Materials fully describe the Board's response to Light Street's proposal.[116] And Plaintiffs question whether "the Consortium ma[d]e an affirmative decision to compensate Svane for his unvested RSUs, or [if] Svane and/or the Company proposed that compensation," but the Proxy confirms that Svane was entitled to 100% of his unvested equity awards in the event of a sale resulting in his

---

making, no such evidence was presented here with respect to Bloom's Board. Thus, Jacob failed to carry his burden to prove that emails and other electronic communications among Company fiduciaries are necessary and essential to fulfill his investigative purpose.").

[113] PB at 55.

[114] *Id.*

[115] *Id.* at 56.

[116] *See* DX P; DX NN; PX 49; DX OO.

38

termination without cause or resignation with good reason.[117]  In short, none of Plaintiffs' questions support the broad email searches they have requested.

### 3. Zendesk's Financial Performance

Finally, Plaintiffs seek electronic communications concerning Zendesk's financial performance.  To support this request, Plaintiffs assert that the Production "does not account for the Company's financial health in a way that justifies the revised [June] Projections or the price paid in the Transaction"[118] and "is devoid of information that could even conceivably explain how the $127-$132 per share offer 'significantly undervalued' Zendesk in February but the $77.50 per share offer four months later did not."[119]  Even if Plaintiffs are not convinced that the financial information produced "justifies" the Transaction, Plaintiffs already have (with one exception) all documents necessary and essential to evaluate Zendesk's financial performance in connection with the Transaction.

First, Plaintiffs contend that the Production fails to adequately explain the Board's consideration of alternative proposals.  For example, Plaintiffs say the

---

[117] Proxy at 67.  Plaintiffs also contrast language in a draft "employee Q&A," which stated "[t]here are no immediate changes contemplated for the management team," with a revised version stating that Zendesk did not "anticipate any changes to management as a result of this acquisition."  PB at 56.  The change is immaterial and does not support the production of electronic communications.

[118] PB at 57.

[119] *Id.*

39

Production lacks "any formal assessment or accounting of the Company's operational and financial health as of February 2022, when the Company rejected the $127-$132 per share offer from the Consortium."[120]  But as Plaintiffs concede, "the February 9[, 2022] meeting minutes show that the Board relied on Goldman's prior valuation that was prepared 'in connection with the proposed Momentive [Transaction] . . . .'"[121]  Plaintiffs have that valuation,[122] as well as discussion materials prepared by Centerview for the February 9, 2022 meeting.[123]  Similarly, Plaintiffs suggest that the Production contains "no explanation" for why the Board rejected Light Street's proposal.  It does.  The Production contains a 22-page presentation from Qatalyst summarizing the Light Street proposal and key issues to consider, with supporting valuation information.[124]

Plaintiffs complain that the valuations on which the Board relied do not "justify" the Board's responses.  This argument misstates the standard.  While a books and records production should be sufficient to answer "the who, what, where, when, and why of the possible wrongdoing,"[125] the documents produced need not

---

[120] *Id.*

[121] *Id.* at 57-58.

[122] DX TT.

[123] PX 19.

[124] DX OO.

[125] *Hightower*, 2022 WL 3970155, at *9.

"justify" the merits of the Board's decision-making to the stockholder plaintiffs' satisfaction. Here, the documents in Plaintiffs' possession are sufficient to understand and evaluate the Board's response to alternative proposals. That is what the case law requires.

Second, Plaintiffs request monthly bookings figures. The Proxy explains that: (1) the Consortium decreased its offer on June 17 based on "actual gross and net bookings for May 2022, which indicated weaker business momentum than in prior months, as well as an updated view of expected gross and net bookings for June 2022"[126]; (2) Zendesk management prepared the June Projections to take into account, among other things, "below-expectation actual gross and net bookings for the months of April and May 2022"[127]; and (3) in considering the value offered in the Transaction relative to Zendesk's standalone prospects, the Board considered actual gross bookings for April and May 2022.[128] Despite the Proxy's repeated

---

[126] Proxy at 37.

[127] *Id*. at 62-63.

[128] *See id*. at 41 (explaining that the Board considered, in the month of April 2022, "actual gross bookings of $34.6 million, which represented a year-over-year decline of 7% and fell below the internal outlook of $42.7 million by 19%, and net bookings of $16.5 million, which represented a year-over-year decline of approximately 13% and fell below the internal outlook of $20.8 million by 20%," and in the month of May 2022, "actual gross bookings of $35.7 million, which represented a year-over-year decline of approximately 16% and fell below the internal outlook of $51.6 million by 31%, and net bookings of $16.8 million, which represented a year-over-year decline of approximately 36% and fell below the internal outlook of $32.2 million by 48%").

41

reference to the monthly bookings on which bidders, management, and the Board relied, the Production contains only quarterly bookings. Plaintiffs have established that monthly bookings for April, May, and June 2022 are necessary for their investigation purpose.

Finally, Plaintiffs assert that "the formal documents produced to date fail to show how or why the final projections used by Zendesk to purportedly justify the Transaction were prepared and selected."[129] Not so. Minutes in the Production explain that on June 19, 2023, Zendesk management informed the Board that they "were currently updating the Company's long-range plan to account for the significant changes in economic conditions and negative trends in gross and net bookings for the Company and deterioration in business momentum that deviated materially from the assumptions underlying prior expectations."[130] The final June Projections were presented to the Board in advance of the June 22, 2023 meeting, during which Glaser presented the updated projections "in light of the evolving

---

[129] PB at 59.

[130] PX 41. The Proxy similarly explains that "in the context of evaluating the Consortium's proposals, Zendesk management updated the March 2022 Case to take into account changes in the internal and external business environment, including negative trends in gross and net bookings momentum, below-expectation actual gross and net bookings for the months of April and May 2022, challenges to Zendesk's performance resulting from elevated levels of attrition in critical sales functions and employee distraction as well as significant changes in economic conditions facing Zendesk and its industry more generally, including increased risk of recession, persistent high inflation and the impact of macroeconomic headwinds on Zendesk's customer segments . . . ." Proxy at 62-63.

42

market conditions, including the increased risk of recession, high inflation, impacts on customer segments and a decrease in actual gross and net bookings and increased churn and contraction, as well as challenges to the Company's performance resulting from elevated levels of attrition in critical sales functions, employee distraction, and a reduction in investment growth."[131] The Board then authorized its advisors to move forward with finalizing definitive agreements for a transaction through which the Consortium would acquire Zendesk for $77.50 per share.[132] Minutes of the June 23, 2023 Board meeting reflect the Board's approval of the June Projections.[133] Plaintiffs also have the June Projections[134] and quarterly bookings figures, and should receive the monthly bookings for April, May, and June 2022.

According to Plaintiffs, these explanations still "raise more questions than they answer."[135] Plaintiffs point out that Zendesk's financial condition did not materially change between June 6, 2022, when the Board terminated the strategic review, and June 23, 2022, when the Transaction was approved. Plaintiffs also note that the Board did not direct management to prepare the June Projections in the first

---

[131] PX 42.

[132] *Id.*

[133] PX 52.

[134] PX 45; PX 51.

[135] PB at 62.

instance, the Board formally approved the June Projections at the same meeting it approved the Transaction, and the Company's financial advisors did not rely on the "Upside Opportunity" case in preparing the financial analyses underlying their fairness opinions, notwithstanding that the Company had already undertaken some efforts contemplated by the higher set of projections.[136]

Rather than undermine the sufficiency of the Production, these arguments confirm that the documents already in Plaintiffs' possession are sufficient to understand and evaluate the Board's process and "effectively address the problem" (if there is one) through litigation. *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002). While incremental details could be helpful to flesh out Plaintiffs' theories, that does not support Plaintiffs' request for "comprehensive,"[137] discovery-style email production through a books and records action.[138]

---

[136] *Id.* at 62-63.

[137] *See KT4 Partners LLC*, 203 A.3d at 751 (explaining that Section "220 inspections are not tantamount to 'comprehensive discovery'").

[138] *See id.* at 755 (noting that Section 220 contemplates the production of a "discrete set of books and records" that is "much less extensive than would likely be produced in discovery under the standards of Rule 26 in a plenary suit"); *Saito*, 806 A.2d at 114 ("[Section 220] does not open the door to the wide ranging discovery that would be available in support of litigation").

## III. CONCLUSION

For the reasons explained above, I recommend that judgment be entered for Plaintiffs to the extent that they seek monthly bookings figures for April, May, and June 2022, and for Zendesk as to all other requests. The parties should meet and confer regarding a form of implementing order within five days of this final report becoming an order of the Court. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2). The stay of exceptions entered under the Chancellor's May 5, 2023 assignment letter is hereby lifted.